# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Adam Dinitz, Amy Brunet, Brian Johnson, Brian LaFalce, Bruce Mason, Chad Weaver, Christopher Horton, Daniel Carnine, David Gaddis, David Lima, David Loehr, Donald Smith, Jr., Donnie Ray Foley, Grace Gilmore, Gregory Brakefield, Jace Parkhurst, Jeffrey Horvath, Jennifer Melberg, John Matthews, Joseph Davids, Joseph McDaniels, III, Julianne Kovein, Karen Drews, Kathleen Martinez, Kenneth Brockington, Manuel Martinez, Jr., Melvin Drews, Michael Alamorian, Michael Montgomery, Morris Gordin, Nathaniel Haiden, Omar Guc, Pavel Gazhenko, Peter Christie, Peter Gray, Rickie Donovan Baker, Romeo Chicco, Samantha Horton, Scott Smith, Sean Willey, Stephen Griner, Steven Angerhofer, Suzanne Block, Taylor DeVilbiss, Thomas Fuhrer, and Tory Skyers,<br><br>        Plaintiffs,<br><br>v.<br><br>Verisk Analytics, Inc.,<br><br>        Defendant. | Case No. 24-11157<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.     Using hardware and software it pre-installed in consumers' vehicles, General Motors LLC and OnStar LLC (together "GM") secretly collected highly personal and private behavior from its customers' cars "upon every ignition cycle,"[1] including the consumers' location, routes driven, driving schedule, fuel or charging levels, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, driver attention, and more.[2] GM secretly funneled that data, bundled with consumers' personally-identifying information, to data brokers and consumer reporting agencies including Verisk Analytics, Inc. ("Verisk") in a joint scheme to use the data for profit. Over the course of a decade, Verisk amassed billions of miles of consumer behavior data and made millions of dollars at the expense of consumers' privacy.

2.     Plaintiffs are among the millions of GM drivers whose driving data was collected and exploited by Verisk without their full knowledge and consent, and who have suffered significant invasions of privacy as a result. Plaintiffs and Class

---

[1] *Help: Smart Driver*, ONSTAR.COM (version on Feb. 5, 2023) https://web.archive.org/web/20230205070405/https://www.onstar.com/support/faq/smart-driver (last accessed Nov. 10, 2024).

[2] *Help: Smart Driver*, ONSTAR.COM (version on Feb. 5, 2023) https://web.archive.org/web/20230205070405/https://www.onstar.com/support/faq/smart-driver (last accessed Nov. 10, 2024).

Members are entitled to compensatory, consequential, statutory, punitive, general, and nominal damages, disgorgement and restitution, and injunctive relief as described below.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves violations of federal law. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

4.     This Court has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action in which at least one member of the proposed class is a citizen of a state different from that of Verisk; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

5.     This Court has personal jurisdiction over Verisk and venue is proper pursuant to 28 U.S.C. § 1391 because Verisk regularly conducts substantial business in this District, has its headquarters in this District, and a substantial part of the events giving rise to the claims emanated from activities within this District.

6.     Plaintiffs file this complaint as a basis to confer subject matter jurisdiction over Plaintiffs' claims, which will be litigated for pretrial purposes as part of the pending *In re Consumer Vehicle Driving Data Tracking Collection* MDL, No. 24-md-03115 (N.D. Ga.).

## PLAINTIFFS

7.     Plaintiffs file this complaint for jurisdictional purposes. Additional facts as they are known are alleged in Plaintiffs' consolidated complaint, which is being filed with the pending MDL. Plaintiffs bring these allegations based upon information and belief and with the information that is best known and available to them as of the date of filing the complaint.  Certain information from Verisk is no longer available as of the date of filing.

8.     Plaintiff Chad Weaver is a resident and citizen of the state of Alabama. On or about April 17, 2023, he purchased a 2023 Chevrolet Corvette from a GM dealer in Hoover, Alabama.

9.     Plaintiff Brian Johnson is a resident and citizen of the state of Arizona. On or about November 1, 2023, he purchased a 2023 Chevrolet Tahoe from a GM dealer.

10.    Plaintiff David Loehr is a resident and citizen of the state of Arizona. On or about February 1, 2023, he purchased a 2023 Chevrolet Colorado from a GM dealer in Las Vegas, Nevada.

11.    Plaintiff Daniel Carnine is a resident and citizen of the state of California.  In July 2018, he purchased a 2018 Chevrolet Bolt from a GM dealer in Roseville, California.

12.    Plaintiff Donald Smith, Jr., is a resident and citizen of the state of California. In March 2021, he leased a 2020 Chevrolet Bolt from a GM dealer in California.

13.    Plaintiff Nathaniel Haiden is a resident and citizen of the state of California. On or about December 3, 2022, he purchased a 2023 Chevrolet Bolt from a GM dealer in Monrovia, California.

14.    Plaintiff Amy Brunet is a resident and citizen of the state of Connecticut. In March 2021, she purchased a 2021 Cadillac Escalade from a GM dealer in Warwick, Rhode Island.

15.    Plaintiff Michael Alamorian is a resident and citizen of the state of Delaware. He has owned numerous GM vehicles over the years, including a 2023 GM Canyon he purchased from a GM dealer in Elkton, Maryland.

16.    Plaintiff Romeo Chicco is a resident and citizen of the state of Florida. On or about November 16, 2021, he purchased a 2021 Cadillac XT6 from a GM dealer in Delray Beach, Florida.

17.    Plaintiff Suzanne Block is a resident and citizen of the state of Florida. On or about January 11, 2022, she leased a 2022 Buick Encore from a GM dealer in Pompano, Florida.

18.     Plaintiff Tory Skyers is a resident and citizen of the state of Florida. In March 2022, he purchased a 2019 Cadillac CTS-V from a GM dealer in Tampa, Florida.

19.     Plaintiff Stephen Griner is a resident and citizen of the state of Georgia. He has purchased a total of seven GM vehicles.

20.     Plaintiff David Gaddis is a resident and citizen of the state of Georgia. He has purchased a number of GM vehicles.

21.     Plaintiff Pavel Gazhenko is a resident and citizen of the state of Idaho. On or about June 2024 he purchased a 2023 GMC Sierra 1500 from a GM dealer in Nampa, Idaho.

22.     Plaintiff Jeffrey Horvath is a resident and citizen of the state of Illinois. On or about May 2023, he purchased a 2023 CT4 V Black Wing Cadillac from a GM dealer in Lansing, Michigan.

23.     Plaintiff Adam Dinitz is a resident and citizen of the state of Illinois. On or about October 1, 2020, he purchased a 2020 GMC Sierra HD Double Cab from a GM dealer in McHenry, Illinois.

24.     Plaintiff Peter Gray is a resident and citizen of the state of Illinois. On or about January 2024, he purchased a 2023 Chevrolet Bolt from a GM dealer in Villa Park, Illinois.

25.     Plaintiff David Lima is a resident and citizen of the state of Indiana. On or about April 18, 2020, he purchased a 2019 Chevrolet Corvette Grand Sport Convertible from a GM dealer in Cincinnati, Ohio.

26.     Plaintiff Manuel Martinez, Jr., is a resident and citizen of the state of Kansas. On or about May 10, 2019, he and his wife purchased a 2019 GMC Yukon from a GM dealer in Kansas City, Missouri. On or about September 7, 2023, Plaintiff Manuel Martinez, Jr. and his wife traded in their 2019 Yukon for a 2023 GMC Yukon at a GM dealer in Olathe, Kansas.

27.     Plaintiff Kathleen Martinez is a resident and citizen of the state of Kansas. On or about May 10, 2019, she and her husband purchased a 2019 GMC Yukon from a GM dealer in Kansas City, Missouri. On or about September 7, 2023, Plaintiff Kathleen Martinez and her husband traded in their 2019 Yukon for a 2023 GMC Yukon at a GM dealer in Olathe, Kansas.

28.     Plaintiff Donnie Ray Foley is a resident and citizen of the state of Kentucky. On or about June 2023, he purchased a 2019 Cadillac XT5 from a GM dealer in Corydon, Indiana.

29.     Plaintiff Joseph McDaniels, III, is a resident and citizen of the state of Maryland. On or about June 7, 2023, he purchased a 2023 Chevrolet Bolt from a GM dealer in Silver Spring, Maryland.

30.     Plaintiff Brian LaFalce is a resident and citizen of the state of Michigan. On or about December 29, 2022, he purchased a 2023 Chevrolet Equinox from a GM dealer in Grand Rapids, Michigan.

31.     Plaintiff Karen Drews is a resident and citizen of the state of Michigan. On or about May 6, 2020, she and her husband purchased a 2019 Chevrolet Corvette from a GM dealer in Merrillville, Indiana. On or about March 17, 2020, she and her husband also purchased a 2020 Buick Enclave from a GM dealer in Jackson, Michigan.

32.     Plaintiff Melvin Drews is a resident and citizen of the state of Michigan. On or about May 6, 2020, he and his wife purchased a 2019 Chevrolet Corvette from a GM dealer in Merrillville, Indiana. On or about March 17, 2020, he and his wife also purchased a 2020 Buick Enclave from a GM dealer in Jackson, Michigan.

33.     Plaintiff Kenneth Brockington is a resident and citizen of the state of Michigan. On or about May 8, 2021, he purchased a 2021 Cadillac Escalade from a GM dealer in Plymouth, Michigan.

34.     Plaintiff Grace Gilmore is a resident and citizen of the state of Mississippi. On or about December 2019, she purchased a 2020 Chevrolet Spark from a GM dealer in Picayune, Mississippi.

35.    Plaintiff Jennifer Melberg is a resident and citizen of the state of Nevada. On about May 25, 2018, she purchased a 2018 Chevrolet Camaro from a GM dealer in Las Vegas, Nevada.

36.    Plaintiff John Matthews is a resident and citizen of the state of New Jersey. On or about September 2023, he purchased a 2023 Chevrolet Bolt EUV from a GM dealer in Lakewood, New Jersey.

37.    Plaintiff Morris Gordin is a resident and citizen of the state of New Jersey. On or about December 2022, he purchased a 2023 Chevrolet Bolt EUV LT from a GM dealer in Livingston, New Jersey.

38.    Plaintiff Joseph Davids is a resident and citizen of the state of New York. On or about July 2021, he leased a 2021 Cadillac XT5 from a GM dealer in Farmingdale, New York.

39.    Plaintiff Scott Smith is a resident and citizen of the state of New York. On or about June 2022, he leased a 2022 Buick Encore GX from a GM dealer in Malone, New York.

40.    Plaintiff Thomas Fuhrer is a resident and citizen of the state of North Carolina. In 2019, he purchased a 2019 Chevrolet Cruze from a GM dealer in Wilmington, North Carolina.

41.    Plaintiff Rickie Donovan Baker is a resident and citizen of the state of North Carolina. On or about November 2023, he purchased a 2023 Chevrolet Corvette z51 from a GM dealer in Hickory, North Carolina.

42.    Plaintiff Bruce Mason is a resident and citizen of the state of South Carolina. In or around November 2023, he purchased a 2024 Chevrolet Corvette Stingray and a 2024 Chevrolet Silverado from a GM dealer in Newton, North Carolina.

43.    Plaintiff Julianne Kovein is a resident and citizen of the state of Ohio. She has owned and/or leased numerous GM vehicles with her husband over the years, including a 2016 GM Acadia leased from a GM dealer in Medina, Ohio, a 2019 Chevrolet Traverse purchased from a GM dealer in Akron, Ohio, and a 2023 Chevrolet Silverado purchased from a GM dealer in Rittman, Ohio.

44.    Plaintiff Samantha Horton is a resident and citizen of the state of Ohio. On or about May 6, 2023, she and her husband purchased a 2023 Chevrolet Silverado 1500 LT from a GM dealer in Massillon, Ohio.

45.    Plaintiff Christopher Horton is a resident and citizen of the state of Ohio. On or about May 6, 2023, he and his wife purchased a 2023 Chevrolet Silverado 1500 LT from a GM dealer in Massillon, Ohio.

46.    Plaintiff Peter Christie is a resident and citizen of the state of Ohio. He has purchased numerous GM vehicles over the years, including a 2019 Chevy Cruze he purchased from a GM dealer in Warren, Ohio.

47.    Plaintiff Gregory Brakefield is a resident and citizen of the state of Oklahoma. In or about February 2021, he leased a 2021 GM Suburban from a GM Chevrolet dealer in Tulsa, Oklahoma. He purchased the 2021 Suburban in or about March 2024.

48.    Plaintiff Michael Montgomery is a resident and citizen of the state of Oregon. On or about February 22, 2019, he purchased a 2019 GMC Sierra 1500 AT4 from a GM Buick dealer in Salem, Oregon.

49.    Plaintiff Sean Willey is a resident and citizen of the state of Pennsylvania. On or about January 9, 2024, he purchased a 2021 Cadillac CT4 from a GM dealer in Lancaster, Pennsylvania.

50.    Plaintiff Omar Guc is a resident and citizen of the state of Pennsylvania. On or about October 2023, he purchased a 2023 Chevrolet Corvette Z06 from a GM dealer in Nashua, New Hampshire.

51.    Plaintiff Steven Angerhofer is a resident and citizen of the state of South Dakota. On or about March 2023, he purchased a 2023 Chevrolet Corvette from a GM dealer in Pipestone, Minnesota.

52.    Plaintiff Jace Parkhurst is a resident and citizen of the state of Texas. On or about February 10, 2024, he purchased a 2024 GM Yukon Denali from a GM dealer in Carrolton, Texas.

53.    Plaintiff Taylor DeVilbiss is a resident and citizen of the state of Washington. On or about June 23, 2023, he purchased a 2023 Chevrolet Colorado from a GM dealer in Milwaukie, Oregon.

54.    Each Plaintiff had their driving data and personal information collected and disseminated from their GM vehicles without their knowledge or consent.

## DEFENDANT AND UNNAMED, THIRD PARTIES

55.    General Motors LLC ("GM") is a limited liability company organized under the laws of the state of Delaware, with its headquarters and principal place of business in Detroit, Michigan. GM manufactures and sells vehicles in the United States and across the world, including Chevrolet, GMC, Cadillac, and Buick branded vehicles. GM is not a defendant in this action.

56.    OnStar LLC ("OnStar") is a limited liability company organized under the laws of the state of Delaware, with its headquarters and principal place of business in Detroit, Michigan. OnStar is a subsidiary of GM. OnStar provides communications, security, emergency services, navigation, diagnostics, and information services to GM vehicles in the United States and around the world. OnStar is not a defendant in this action.

57.    Both GM and OnStar are wholly owned by General Motors Holdings, LLC. GM and OnStar are collectively referred to herein as "GM."

58.    LexisNexis Risk Solutions Inc. ("LexisNexis") is a Delaware corporation with its headquarters and principal place of business in Alpharetta, Georgia. LexisNexis is a global data and analytics company that provides data and technology services, analytics, predictive insights, and fraud prevention for a wide range of industries, including the automotive industry. LexisNexis is not a defendant in this action.

59.    Defendant Verisk Analytics, Inc. ("Verisk") is a Delaware corporation with its headquarters and principal place of business in Jersey City, New Jersey. Verisk traces its history to 1971, when Insurance Services Office, Inc. ("ISO") was formed as an association of insurance companies to gather statistical data and other information from insurers and report to regulators.[3] On May 23, 2008, in contemplation of its initial public offering, ISO formed Verisk Analytics, Inc. as a wholly owned subsidiary to be the holding company for the business.[4] On October 6, 2009, in connection with the IPO, the company effected a reorganization whereby

---

[3] *Verisk Analytics, Inc. 2023 Annual Report*, at p.4, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001442145/d75862d5-9f37-4064-ae16-68c5c71e87f4.pdf.
[4] *Id.* at 5.

ISO became a wholly owned subsidiary of Verisk.[5] Only Verisk is named as a Defendant in this action.

## STATEMENT OF FACTS

60.    Since 2015, GM has sold or leased millions of vehicles under its four brands, Chevrolet, GMC, Cadillac, and Buick, through a network of over 4,000 GM dealers nationwide.[6] In 2023 alone, GM sold roughly 2.6 million vehicles across the United States[7] and offered services via OnStar, GM's in-vehicle telematics technology, to "more than 21 million connected vehicles globally[.]"[8]

61.    GM essentially invented the term "telematics" when it launched OnStar in 1996 as the industry's first embedded telematics system. A combination of "telecommunication" and "informatics," telematics describes vehicle systems that combine Global Positioning System ("GPS") and cellular technologies with onboard electronics to collect and generate data.[9] As one LexisNexis telematics data scientist

---

[5] *Id.*

[6] *Verisk Analytics, Inc. 2023 Annual Report*, at p.4, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001442145/d75862d5-9f37-4064-ae16-68c5c71e87f4.pdf (last accessed Nov. 23, 2024).

[7] Michael Wayland, *GM's 2023 U.S. Vehicle Sales Were Its Best Since 2019*, CNBC (Jan. 3, 2024), https://www.cnbc.com/2024/01/03/gm-2023-us-vehicle-sales.html (last accessed Nov. 24, 2024).

[8] *General Motors Company 2021 Annual Report*.

[9] Shanna Freeman, *How OnStar Works*, HOWSTUFFWORKS, (Feb. 8, 2006), https://auto.howstuff works.com/onstar.htm (last accessed Nov. 26, 2024).

explained it, "telematics is a collection of data from any device, such as a smart phone app or plug in, that tells a story about a driver in their vehicle."[10]

62.    When GM first launched OnStar, it was a "dealer-installed" device.[11] Since 2015 model year vehicles rolled off of assembly lines, OnStar hardware and software came installed as original, standard equipment in all GM vehicles before they ever reach the dealership—"now everything you need," GM says, "is a button-push away."[12]

63.    OnStar began primarily to connect drivers to first responders after an accident.[13] OnStar's capabilities significantly expanded over time.

64.    As OnStar's functionality expanded over the years, GM has gained the ability to collect and transmit highly complex, granular, vehicle-specific driver behavior and location data from its vehicles ("driving data"), including:

- Synthetic key
- Trip ID
- Element timestamp
- Event code
- Element code
- Element value

---

[10] Lisa Greenberg, *Presentation: Driving Data Science for Automakers and Insurers*, LEXISNEXIS RISK SOLUTIONS (June 3, 2021), available at https://vimeo.com/558702815 (last accessed Nov. 24, 2024).

[11] *The evolution of OnStar,* ONSTAR.COM, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations (last accessed Nov. 23, 2024).

[12] *The evolution of OnStar,* ONSTAR.COM, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations (last accessed Nov. 23, 2024).

[13] *The evolution of OnStar,* ONSTAR.COM, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations (last accessed Nov. 23, 2024).

- Obsolete GPS data indicator
- Current speed
- Current speed validity indicator
- GPS direction
- Driver seat belt status
- GPS estimated horizontal positioning error
- GPS elevation
- Engine idle run time total supported indicator
- Engine idle run time total
- Engine PTO active run time total
- Engine run total supported indicator
- Engine PTO active total run time total supported indicator
- Engine run time total
- Total fuel used
- GPS time
- GPS latitude coordinate
- Lifetime energy used
- GPS longitudinal coordinate
- Location time offset
- Odometer reading
- Speed rate of change
- Speed rate of change positive indicator
- Vehicle ignition system power mode
- Driver seatbelt latched
- Hard acceleration occurs
- Hard brake occurs
- Ignition off
- Ignition on
- Speed over 80 miles per hour
- Speed under 80 miles per hour

65.    Since 2015, GM has had the capability to collect this data and more from every consumer, upon every ignition cycle, for every GM vehicle model year 2015 or newer. This data can be used to create invasive, detailed profiles on both the

car and its drivers that are rich profit opportunities for GM, and any third parties that gain access to it.

66.    Since OnStar's creation, GM has fought back against fears that OnStar could be used to spy on consumers, with critics cautioning that OnStar's functionality could lead to "Big Brother"-type invasions of consumer privacy, especially if GM allowed access to third parties.[14] GM touts OnStar as an "in-vehicle safety and security system," and tells its customers and the public that OnStar was "designed to help protect you and your family and provide peace of mind on the road[.]"[15] While promising its customers that the massive quantity of data it collects on each consumer will not be used or shared without their consent, GM, Verisk, and other data brokers duplicitously used OnStar's embedded technology to harvest, in real time, the driving data on each of its drivers and sold that data for profit.

67.    To maximize GM's ability to harvest data from its customers in line with its new business model, GM launched a series of coordinated changes to its vehicles and OnStar offerings.

---

[14] Shanna Freeman, *How OnStar Works*, HOWSTUFFWORKS, (Feb. 8, 2006), https://auto.howstuff works.com/onstar.htm (last accessed Nov. 26, 2024).
[15] *Help: Chevrolet*, ONSTAR.COM, https://www.onstar.com/support/faq/chevrolet (last accessed Nov. 25, 2024).

68.    As part of a new, free "OnStar Basic Plan," GM promoted "OnStar Smart Driver" as a new service that "provided customers with information about their driving behavior[.]"

69.    GM framed Smart Driver as a "gamified" way for drivers to improve their driving and reduce depreciation of their vehicles, and promised to provide participants with a driving score to understand how their safe driving compares to other drivers, monthly summaries, and opportunities to complete specific challenges and earn "achievements" or "badges."[16]

70.    Knowing its customers would reject the program outright if they knew GM's plans for data monetization, GM concealed that OnStar Smart Driver was a core part of GM's strategic plan to collect and monetize a steady stream of driving data from consumers' cars.

71.    Indeed, GM has experience with customers rejecting such programs based upon the very same concerns customers raise now.  In 2011, GM opted not to begin a program that has many of the same features as the Smart Driver program[17]

---

[16] *See, e.g., Reading Into Your Chevrolet, Buick, GMC and Cadillac Smart Driver Score*, OnStar (Jan. 28, 2020), https://www.onstar.ca/en/tips/reading-into-your-smart- driver-score (addressing OnStar Smart Driver's operation in Canada, which largely mirrors its operation in U.S. vehicles).

[17] Kashmir Hill, *GM's Boneheaded Privacy Mistake With OnStar*, FORBES (Sept. 26, 2011) https://www.forbes.com/sites/kashmirhill/2011/09/26/gms-boneheaded-privacy-mistake-with-onstar/ (last accessed Nov. 25, 2024).

given the backlash it was already facing from consumers over GM spyware. Based upon information and belief, Verisk was aware of this backlash.

72.    After some time passed from GM's botched attempt to previously collect and monetize driver data, GM eventually surreptitiously began to monetize driver data using the OnStar Smart Driver program.

73.    Using GM's in-vehicle telematics equipment, GM used Smart Driver as a means to intercept extensive, highly private data about consumers' driving behavior and their location data from a vehicle's on-board computer, including, for each trip, every instance of "hard braking," "hard acceleration," driving without a seatbelt, driving over 80mph, and "late night driving."

74.    GM collected this data at every ignition cycle and transmitted it from vehicles to GM's servers "in real time" using the car's cellular network.[18]

75.    GM never disclosed to customers that their Smart Driver data would be shared or sold to third party data brokers and consumer reporting agencies. Unless customers "separately" activated an "insurance discounts eligibility" feature, GM also never disclosed to customers that their Smart Driver data would be disclosed to insurers.

---

[18] *GM's Letter Response to Senate Inquiry* (Dec. 21, 2023), available at https://interactive.wthr.com/pdfs/automakers-response-to-markey.pdf (last accessed Nov. 23, 2024).

76.    Unbeknownst to consumers, GM collected and sold consumers' driving data and consumers' personally-identifiable information to Verisk for, among other things, the development of usage-based insurance "data exchanges." Together, with GM, Verisk amassed millions of consumers' highly private, personal information, generated substantial profit, and then licensed that information to an unknown number of unknown third parties.

77.    Data brokers specifically, including Verisk, sought to carve out a role in "build[ing] an ecosystem that supports profitable growth."[19] Verisk vied for access to consumers' Driving Data, pitching the opportunity for automakers and insurers alike to use them as a "single point of contact" between "hundreds" of automakers and "hundreds of insurers wanting access to the data[.]"[20]

78.    Verisk markets itself as "[a]s a strategic partner to the global insurance industry," that provides "help" to partners "along the path to profitable growth" through "advanced data analytics, software, scientific research, and deep industry

---

[19] Mark Anquillare et al., *Accelerating competitiveness with a digital auto insurance ecosystem*, VERISK (Sept. 30, 2021), available at https://web.archive.org/web/20230208094606/https://www.verisk.com/insurance/visualize/accelerating-competitiveness-with-a-digital-auto-insurance-ecosystem/.

[20] *See, e.g., Verisk Teams with Driveway Software on Smartphone Telematics for Autos*, INSURANCE JOURNAL (Dec. 6, 2016), available at https://web.archive.org/web/20161209164944/http://www.insurancejournal.com/news/national/2016/12/06/434322.htm; *Cutting in the middleman for data handling*, AUTOMOTIVE TU (Feb. 19, 2016), archived at https://web.archive.org/web/20160518041846/http://analysis.tu-auto.com/insurance-legal/cutting-middleman-data-handling.

knowledge."[21] Since 2014, Verisk has operated a "Verisk Telematics," division, which promised to "innovate and provide solutions that help our customers retain their edge and improve their margins[.]"[22]

79.    In October 2015, GM contracted with Verisk, "open[ing] the floodgates to shared driving information[.]"[23]

80.    According to an article by Auto Insurance Report, "[s]everal prominent data vendors were vying for the GM contract once the automaker expressed its willingness to share, but Verisk won the prize, and along with it an undisclosed

---

[21] *Industry Leading Insurance Solutions*, VERISK, https://www.verisk.com/insurance/ (last accessed Nov. 26, 2024).
[22] *Press Release: New Verisk Telematics Division Offers Filed Driver Discount Program*, VERISK (Apr. 2, 2014), archived at https://web.archive.org/web/20140704005241/http://www.verisk.com/Press-Releases/2014/new-verisk-telematics-division-offers-filed-driver-discount-program.html.
[23] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

period of exclusivity."[24] The GM contract was a "major win for Verisk, which ha[d] been fighting for a foothold in the UBI marketplace."[25]

81.   At the time Verisk won the GM contract, it had been aggressively pushing the "need" for a telematics exchange for the insurance industry, explaining: "**The ultimate objective** for usage-based insurance **is the same for both the automobile and telecommunications industries**: **the vehicle as a fully connected data center**."[26]

82.   Verisk and GM jointly presented their agreement at the 2016 Auto Insurance Report Conference, in a presentation titled "Shared Driving Data Has Arrived:"[27]

---

[24] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B 145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[25] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B 145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

[26] Jim Levendusky, *Telematics data exchange needed for auto insurance industry*, VERISK .COM (July 1, 2015), archived at https://web.archive.org/web/20201030162018/https://www.verisk.com/insurance/v isualize/telematics-data-exchange-needed-for-auto-insurance-industry/ (emphasis added).

[27] *Auto Insurance Report National Conference 2016 Agenda*, available at https://web.archive.org/web/20161019195519/http://riskinformation.com:80/wp-content/uploads/2010/12/AIRNC2016program.pdf.

**1:50  –  2:40 pm**    **Shared Driving Data Has Arrived**
*Neil Spector, President, Underwriting Solutions, Verisk;*
*Greg Ross, Director, Business Development and Alliances, Global Connected*
*Customer Experience, General Motors*

As usage-based-insurance started to take firm root in the auto insurance market just a few years ago, it did not seem likely that insurance companies would be able to keep their customers' driving data to themselves for very long. After all, driving behavior data is not dissimilar to credit behavior data, which is housed in central bureaus so it can be shared by all, and enables consumers to shop around for the best deal. We now know that the life of wholly owned driver data was about 18 years, which is how long it has been since the first public UBI pilot ("Autograph") by Progressive Insurance. In this session we'll learn about the launch of a new data clearinghouse that will mark the move to end proprietary driver data. General Motor's OnStar started this ball rolling as far back as 2007, when a senior executive came to our conference and all but begged insurers to help, and then made it a reality by signing on with Verisk last year to build a driving data clearinghouse that will launch this year. During the session Verisk's Neil Spector and GM's Greg Ross will outline the birth of this new data structure, and we will discuss how the idea is likely to evolve in the future.

83.    At the 2016 TU-Automotive Detroit Conference in Michigan, attended by Verisk, GM, and various connected car industry players like Ford, Toyota, Kia, Honda, Nissan, McKinsey, Wejo, and Inrix, the conference hosts headlined the "Next Wave of the Auto Industry" with a presentation by Verisk on "The Changing Landscape of the Telematics Insurance Ecosystem."[28]

---

[28] *Automotive Reinvented – Technology First*, TU-AUTOMOTIVE (version as of Dec. 10, 2015), archived at
https://web.archive.org/web/20151210132057/http://www.tu-auto.com/detroit/;
*The Crucial Debates Shaping Auto Tech*, TU-AUTOMOTIVE (version as of June 27, 2016), available at https://web.archive.org/web/20160627084201/http://www.tu-auto.com/detroit/conference-agenda.php.

## Topics To Guide The Next Wave Of The Auto Industry

✔ **Connected Car Data:** The hottest commodity in the world's hottest tech. industry – are you feeling its full power?

✔ **Safety, ADAS, Autonomous:** Integrate the big ethical, human and legal questions into your tech. roadmap to crack the autonomous code

✔ **Smart Mobility:** Automakers become mobility service providers. From car-sharing to sustainability - OEMs re-invent transportation for the 21st century

✔ **Legislation vs. Technology:** Distraction, liability and licencing. Get legislators on side to make the right decision for the future of auto tech.

✔ **Cyber Security:** Create an impenetrable connected car infrastructure to ensure hackers can't take control of the road

---

**2.10-2.30 The Changing Landscape of the Telematics Insurance Ecosystem: What Does it Mean for You**    

The tremendous market potential for UBI has caused the auto manufacturing, insurance, risk analytics, and Internet of Things (IoT) industries to converge. As a result, all parties involved have an active interest in sharing and capitalizing on telematics data.

- Examine the challenges of collecting, analyzing, and distributing telematics data from multiple sources (e.g. smartphone apps, connected cars) to multiple destinations (e.g. insurers, TSPs)
- Demonstrate how a first-of-its-kind telematics data exchange (essentially an IoT platform) can facilitate this complex data management and distribution process to benefit consumers ultimately
- Understand how connected homes and connected cars can leverage the telematics data exchange infrastructure, thus expanding growth opportunities within the ecosystem


Jim Levendusky
Vice President, Telematics
**Verisk Insurance Solutions**

---

84.      In December 2016, Verisk's VP of Telematics contributed a piece to Risk Management Monitor about the use of telematics data, titled "Driving Data: Advances in Innovative Exchange," in which he wrote: "In recent years, ***telematics has brought auto manufacturers and insurers into alignment***, with both industries

recognizing the potential of telematics…. [which] gives auto-makers the potential ***to capitalize on vast amounts of data collected by the connected cars*** they sell."[29]

85.     Pursuant to the October 2015 agreement, GM sold Verisk its customers' Driving Data and routinely funneled the data from consumers' vehicles to Verisk without consumers' knowledge or consent.[30] GM has admitted that it provided Verisk Driving Data from cars enrolled in OnStar Smart Driver from 2015 until 2024, when GM was forced to discontinue Smart Driver after the true nature of the program was exposed.[31]

86.     The Driving Data GM sold Verisk included granular trip-level data on each vehicle's location, speed, trip mileage, hard braking and acceleration, unique trip identifiers, and other information on how each driver drove their car each time they drove it.[32] GM also sold Verisk data that permitted Verisk to personally identify each customer, such as each customer's ID, name, home address, VIN, vehicle year,

---

[29] James Levendusky, *Driver Data: Advances in Innovative Exchange*, RISK MANAGEMENT MONITOR (Dec. 12, 2016) archived at https://web.archive.org/web/20161218035955/http://www.riskmanagementmonitor .com/driver-data-advances-in-innovative-exchange/ (last accessed Dec. 5, 2024) (emphasis added).

[30] Texas Att. Gen. Pet., p. 26; *see also* Press Release: *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, (Sept. 2, 2015), https://www.verisk.com/company/newsroom/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-j (last accessed Oct. 22, 2024).

[31] Texas Att. Gen. Pet., p. 29.

[32] Texas Att. Gen. Pet., p. 26.

vehicle make, vehicle model, OnStar Vehicle Diagnostics ("OVD") enrollment date, and OVD unenrollment date.[33]

87.    Under the terms of the agreement, Verisk developed a "Driving Score" for each of GM's customers using the customers' Driving Data.[34] Verisk also "mined [the data] to prepare Driving Behavior Data History Reports[,]" and then "sold these reports to auto insurance companies[.]"[35]

88.    Pursuant to the agreement, Verisk developed a database to store the Driving Data, which Verisk called the "Verisk Data Exchange," and marketed and sold licenses to insurance companies to access the exchange.[36] According to one source, "Verisk's Telematics Data Exchange works on a revenue sharing model. The insurance companies that want to see the Driving Data will pay Verisk for the privilege, and then Verisk will share part of that revenue with the data source (in the beginning, OnStar)."[37] In a blog post on Verisk's website, Verisk wrote: "The exchange…appeals to automakers because they will have an opportunity to

---

[33] Texas Att. Gen. Pet., p. 26.
[34] Texas Att. Gen. Pet., p. 26-27.
[35] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf.
[36] Texas Att. Gen. Pet., p. 27.
[37] *GM Changes UBI Game, Sharing OnStar Data with Verisk Exchange*, Auto Insurance Report (Sept. 14, 2015), archived at https://web.archive.org/web/20171023185706/http://img.en25.com/Web/ISO/%7B 145061fe-cd91-4316-903d-e1b84275f343%7D_GM_Changes_the_UBI_Game.pdf.

capitalize on their connected-car data."[38] Likewise, in a 2018 promotional video titled "Innovation in 60 Seconds: What's on the horizon for telematics insurance?" VP of Telematics, Jim Levendusky, previewed the insurer relationships Verisk hoped to achieve through its telematics exchange: *"Insurance companies are very excited about the idea of telematics."*[39]

89.    By 2021, Verisk announced that "**5 of the top 10 insurers** in North America currently utilizing the company's [Verisk's] telematics platform, along with **numerous other midmarket, regional, and insurtech customers**."[40] Over the term of the agreement, Verisk sold licenses to nine insurers, including Root Insurance Company,[41] Nationwide Insurance Company,[42] and, upon information and

---

[38] Paulina Yick, *Underwriting Solutions President Neil Spector on the Future of UBI and Telematics*, Verisk.com (April 18, 2016), archived at https://web.archive.org/web/20230326131915/https://www.verisk.com/blog/under writing-solutions-president-neil-spector-on-the-future-of-ubi-and-telematics/.

[39] *Innovation in 60 Seconds: What's on the horizon for telematics insurance?* VERISK, available at https://www.youtube.com/watch?v=7v2-8phPC98 (last accessed Nov. 26, 2024).

[40] *Verisk Analytics Recognized as the 2021 Company of the Year*, Frost & Sullivan, (Sept. 2021), accessible at https://www.frost.com/wp-content/uploads/2021/09/Verisk-Award-Write-Up.pdf (last accessed Nov. 29, 2024) (emphasis added).

[41] *Root Insurance Company Joins the Verisk Data Exchange*, VERISK (Aug. 15, 2019), available at https://www.verisk.com/company/newsroom/root-insurance-company-joins-the-verisk-data-exchange/.

[42] *Nationwide Joins the Verisk Data Exchange to Drive Usage-Based Insurance Solutions*, VERISK (July 7, 2020), available at https://www.verisk.com/company/newsroom/nationwide-joins-the-verisk-data-exchange-to-drive-usage-based-insurance-solutions/.

belief, American Family Insurance, Bristol West Insurance Group, CSAA Insurance Services, Inc., Metlife Group, Inc., and Pekin Life Insurance, Inc., which accessed the Driving Scores and Driving Data of hundreds of thousands of GM's customers.[43] Upon purchasing a license, insurance companies could review the Driving Behavior Data History Reports and search for the Driving Scores of their insureds or potential insureds, and then use that information to financially harm GM customers, including by denying prospective insureds coverage, increasing current insureds' monthly premiums, or dropping their current insureds from coverage entirely.[44] In a recent Senate investigation into these practices, "Verisk officials confirmed to Senator Wyden's office that the company's contracts with automakers and insurers did not require that driver telematics data only be used to provide discounts."[45]

90.    Verisk paid GM ongoing "royalty payments" based on revenue generated from those licenses.[46] GM also received an initial multi-million-dollar lump sum payment from Verisk in exchange for the Driving Data—a fact that

---

[43] Texas Att. Gen. Pet., p. 27.
[44] Texas Att. Gen. Pet., p. 27.
[45] *Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf (last accessed Nov. 26, 2024).
[46] Texas Att. Gen. Pet., p. 27.

contradicts a statement GM made on September 2, 2015, that it was "not being compensated" for sending Driving Data to Verisk.[47]

91.    GM also contractually required Verisk to solicit "other vehicle [manufacturers], telecom carriers, and other third parties possessing Driving Data and other relevant vehicle data" for inclusion in the Verisk Data Exchange. As a result, Verisk entered into similar agreements with both American Honda Motor Company (on December 7, 2017) and Hyundai Motor America (on March 1, 2018).[48] Between 2018 and 2024, Hyundai shared data from 1.7 million cars with Verisk, and between 2020 and 2024, Honda shared data from 97,000 cars with Verisk.[49]

92.    Although Verisk represented that drivers had consented to this information collection, GM drivers never consented to their information being provided to Verisk, let alone added into a vast, widely-shared "data exchange" that was routinely accessed by "[n]umerous auto insurers."[50]

---

[47] Texas Att. Gen. Pet., p. 26; John Huetter, *With eye toward usage-based insurance, GM to allow OnStar users to share data with Verisk*, REPAIRER DRIVEN NEWS (Sept. 4, 2015), https://www.repairerdrivennews.com/2015/09/04/with-eye-towards-usage-based-insurance-gm-to-allow-onstar-users-to-share-data-with-verisk/ (last accessed Nov. 23, 2024).

[48] Texas Att. Gen. Pet., p. 27.

[49]*Wyden-Markey Auto Privacy Letter* (July 26, 2024), available at https://www.wyden.senate.gov/imo/media/doc/wyden-markey_auto_privacy_letter_to_ftc.pdf (last accessed Nov. 26, 2024).

[50] *Id.*

93.     With consumers in the dark about GM and Verisk's data sharing, the Verisk Data Exchange grew quickly. By the end of 2016, Verisk reported that "85%" of GM's "new-car buyers" were "signing up for the program," and that Verisk had collected Driving Data from 900,000 vehicles covering more than 3 billion trip miles. Verisk anticipated a growth rate of 5,000 to 6,000 cars and 3 million miles a day.[51] By the end of 2017, Verisk had accumulated Driving Data from 3 million GM vehicles with more than 28 billion miles of Driving Data, with the exchange continuing to grow by more than 180,000 cars a month.[52]

94.     By the end of 2018, Verisk had gathered Driving Data from 4.5 million vehicles, representing 32% of U.S. new car sales and 75 billion miles of Driving Data; Verisk continued to add approximately 150,000 cars a month.[53] By the end of 2019, Verisk had added 1.3 million cars and 72 billion miles of Driving Data to the exchange, and continued to add around 115,000 vehicles every month.[54]

---

[51] *Verisk Analytics, Inc. 2016 Annual Report*, available at https://www.annualreports.com/HostedData/AnnualReportArchive/v/NASDAQ_VRSK_2016.pdf.
[52] *Id.*
[53] *Id.*
[54] *Id.*



95.    By July 8, 2019, Verisk announced that it had collected 100 billion miles of Driving Data and was ingesting Driving Data from more than 5 million active vehicles generating more than 20 million trips per day.[55] In the announcement, a Senior Vice President and General Manager of Verisk stated: "There are subtle but important patterns that become visible only from the application of advanced data science to extremely large data sets like ours."[56] That year, Verisk used Driving Data from the Verisk Exchange to identify seasonality patterns in driving behavior for use in insurance modeling.[57] Verisk boasted that the Driving Data was "helping allies

---

[55] *Verisk Data Exchange Reaches Milestone: 100 Billion Miles of Driving Data*, VERISK.COM (July 8, 2019), https://www.verisk.com/company/newsroom/verisk-data-exchange-reaches-milestone-100-billion-miles-of-driving-data/.

[56] *Verisk Data Exchange Reaches Milestone: 100 Billion Miles of Driving Data*, VERISK.COM (July 8, 2019), https://www.verisk.com/company/newsroom/verisk-data-exchange-reaches-milestone-100-billion-miles-of-driving-data/.

[57] *Verisk Data Exchange Reaches Milestone: 100 Billion Miles of Driving Data*, VERISK.COM (July 8, 2019), https://www.verisk.com/company/newsroom/verisk-data-exchange-reaches-milestone-100-billion-miles-of-driving-data/.

shorten their path to market while successfully navigating security, regulatory, and privacy issues."[58]

96.    By the end of 2020, Verisk reported adding "more than 60 billion miles of new driving data" and over 1 million new cars to the exchange.



97.    In February 2021, Verisk boasted that the exchange had over 7.5 million cars and 230 billion miles of Driving Data.[59]

98.    By 2023, Verisk boasted its "auto solutions are powered by a mix of third-party and proprietary data ranging from 2 billion traffic court records to **500**

---

[58] *Verisk Data Exchange Reaches Milestone: 100 Billion Miles of Driving Data*, VERISK.COM (July 8, 2019), https://www.verisk.com/company/newsroom/verisk-data-exchange-reaches-milestone-100-billion-miles-of-driving-data/.

[59] *Press Release: Connected Cars Become an Innovative Lead Generation Channel for Usage-Based Insurance Through New Verisk Program*, VERISK (Feb. 16, 2021), https://investor.verisk.com/News--Events-/Press-Releases--Market-Info/news-details/2021/Connected-Cars-Become-an-Innovative-Lead-Generation-Channel-for-Usage-Based-Insurance-Through-New-Verisk-Program-02-16-2021/default.aspx.

*billion miles of connected car telematics data and we have characteristics on more*
*than 270 million insured drivers and 280 million registered vehicles with access to*
*expansive industry databases on loss costs and claims*."[60]

99.    The rapid growth of Verisk's exchange was critical to Verisk's goal of using the Driving Data to build a portfolio of telematics products.

100.   With a critical mass of continually-refreshing Driving Data in hand, Verisk used consumers' Driving Data to create a "portfolio of point-of-sale solutions designed to aid insurers on their telematics journeys," called the "DrivingDNA Portfolio."[61]

101.   Verisk marketed the DrivingDNA products as "solutions drawn from advanced analytics, extensive in-market experience, and hundreds of billions of miles in the industry-leading Verisk Data Exchange."[62] "Drawing from millions of connected vehicles enrolled in the Verisk Data Exchange, hundreds of billions of trip-miles from consenting drivers, and alliances with numerous leading

---

[60] *Verisk Analytics, Inc. 2023 Annual Report*, available at https://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_VRSK_2023.pdf.

[61] Anthony R. O'Donnell, *Verisk Launches Next-Generation DrivingDNA for UBI Innovation*, INSURANCE INNOVATION REPORTER (June 23, 2021), archived at https://web.archive.org/web/20230127213725/https://iireporter.com/verisk-launches-next-generation-drivingdna-for-ubi-innovation/.

[62] *The Verisk Data Exchange: Personal Auto Telematics*, VERISK (version as of Dec. 11, 2023), archived at https://web.archive.org/web/20231211162628/https://www.verisk.com/insurance/capabilities/telematics/personal-auto-solutions/.

automakers," Verisk promised that "these purpose-built solutions" reflected "Verisk's unmatched data attributes, advanced data management and predictive analytics capabilities" and would "help[] insurers overcome product development and operational challenges…. [and] harness the power of these individualized telematics insights. Just as DNA forms the blueprint for organic life, DrivingDNA reveals distinct characteristics of driving risk through normalized telematics data and scores at point of sale."[63]

102.  "At the center," of the DrivingDNA portfolio was Verisk's product called the "**DrivingDNA Score**," an "advanced predictive model and rating rule for behavior-based segmentation and pricing sophistication."[64] Verisk stated that the DrivingDNA Score was "***[e]nabled by the growth of the Verisk Data Exchange*** and its 260 billion miles of data"[65] and was "a significant update to its predecessor, ***using***

---

[63] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), archived at https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

[64] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), archived at https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

[65] *Verisk Launches Next-Generation DrivingDNA Score to Support Usage-Based Insurance Innovation*, VERISK.COM (July 23, 2021), https://investor.verisk.com/News--Events-/Press-Releases--Market-Info/news-details/2021/Verisk-Launches-Next-Generation-DrivingDNA-Score-to-Support-Usage-Based-Insurance-Innovation-06-23-2021/default.aspx (last accessed Nov. 26, 2024).

***15 times more data for training and validation***"[66] that "[i]incorporate[d] advanced analytics to adjust for seasonality effects, and optionally, distracted driving."[67]

103.   Verisk explained that the new score was "a powerful predictor of future claims and can improve risk segmentation up to 5.5 times above traditional rating variables alone" and "lays the foundation for expansive UBI programs[.]"[68]

104.   Alongside the DrivingDNA Score, Verisk advertised a "new Verisk Distracted Driving Score" available as an optional feature for insurers with mobile-based programs, which could purportedly "adjust the DrivingDNA Score by measuring phone-handling events that have been contextualized by the speeds at which they occur[.]"[69]

---

[66] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), archived at https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

[67] *Verisk Launches Next-Generation DrivingDNA Score to Support Usage-Based Insurance Innovation*, VERISK.COM (July 23, 2021), https://investor.verisk.com/News--Events-/Press-Releases--Market-Info/news-details/2021/Verisk-Launches-Next-Generation-DrivingDNA-Score-to-Support-Usage-Based-Insurance-Innovation-06-23-2021/default.aspx (last accessed Nov. 26, 2024).

[68] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), archived at https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

[69] *Id.*

105.   The DrivingDNA portfolio also included "DrivingDNA Data," which Verisk marketed as the "normalized driving behavior data attributes and mileage information from drivers across multiple leading automakers[.]"[70]

106.   The DrivingDNA portfolio also included "DrivingDNA Lab," a "research and development environment where an insurer can study the lift and impact of Verisk's score and telematics data attributes with information from its existing portfolio." [71]

107.   Verisk marketed this product as providing access to "[m]illions of vehicles available for research and product development in a secure environment."[72]

108.   The DrivingDNA portfolio also included "DrivingDNA Mileage," a tool with "verified odometer readings from millions of connected cars."[73]

---

[70] Anthony R. O'Donnell, *Verisk Launches Next-Generation DrivingDNA for UBI Innovation*, INSURANCE INNOVATION REPORTER (June 23, 2021), archived at https://web.archive.org/web/20230127213725/https://iireporter.com/verisk-launches-next-generation-drivingdna-for-ubi-innovation/.

[71] Joe Wodark, *High-performance analytics empower telematics point-of-sale rating*, VERISK (June 30, 2021), archived at https://web.archive.org/web/20211024071718/https://www.verisk.com/insurance/visualize/high-performance-analytics-for-telematics-point-of-sale-rating/.

[72] *The Verisk Data Exchange: Personal Auto Telematics*, VERISK (version as of Dec. 11, 2023), archived at https://web.archive.org/web/20231211162628/https://www.verisk.com/insurance/capabilities/telematics/personal-auto-solutions/.

[73] *The Verisk Data Exchange: Personal Auto Telematics*, VERISK (version as of Dec. 11, 2023), archived at https://web.archive.org/web/20231211162628/https://www.verisk.com/insurance/capabilities/telematics/personal-auto-solutions/.

109.    Consumers' Driving Data also allowed Verisk to offer a "Discount Alert" product alongside the Verisk Data Exchange.[74]

110.    Verisk regarded each new batch of Driving Data as a profit opportunity. For example, as Verisk explained when Hyundai agreed to share its consumers' data with Verisk:[75]

a.    "U.S. auto insurers can now access detailed  from Hyundai vehicles for their usage- and mileage-based insurance programs…. Hyundai data features are available for modeling and analysis in a secure cloud environment. When combined with corresponding premium and loss data and then depersonalized, this cost-effective solution helps insurers to uncover telematics insights from existing policyholders at scale and supercharges their program development and enhancement initiatives."

b.    "**Point-of-sale underwriting and rating:** Normalized driving behavior and mileage information from consenting Hyundai drivers allows insurers to calculate an applicant's personalized discount at point of sale. Using Verisk's driving score, filed and available in 43 states, insurers have a turnkey behavior-based insurance solution for market entry or expansion. Months of Hyundai telemetry can also be delivered upfront during the quoting process as a customizable data package, tailored for compatibility with insurers' proprietary scoring algorithms."

c.    "**Pay-as-you-drive (PAYD) & UBI monitoring:** Insurers can also receive a continuous data feed of Hyundai driving behaviors or odometer readings for PAYD, UBI, and mileage-based programs. This

---

[74] *The Verisk Data Exchange: Discount Alert*, VERISK (version as of Dec. 11, 2023), archived at https://web.archive.org/web/20231211161135/https://www.verisk.com/insurance/products/discount-alert/.

[75] Joe Wodark, *Hyundai telematics integration goes live on the Verisk Data Exchange*, VERISK (March 29, 2021), archived at https://web.archive.org/web/20211024071912/https://www.verisk.com/insurance/visualize/hyundai-telematics-integration-goes-live-on-the-verisk-data-exchange/.

post-bind information provides the accurate, ongoing insights needed for driver monitoring."

d. "**Insurance lead generation:** With Verisk, insurers can harness the power of connected Hyundai vehicles as a new marketing channel to support the profitable growth of their behavior- or mileage-based programs. Discount Alert allows insurers to deploy personalized marketing offers directly to drivers through Hyundai's online owner portal and contains robust tools to anonymously segment ideal risk targets—ensuring your offers are only sent to qualified leads."

111.  Together with its collection of a vast treasure trove of driving information, Verisk was able to further monetize its investment by combining the Driving Data with information it purchased through company acquisitions.  In November 2001, Verisk announced that it acquired Data Driven Safety, a leading public record data aggregation firm that "specializes in driver risk assessment in the United States."[76] Data Driven Safety built its business through a "unique data collection and management platform," which gathered "information on traffic citations, vehicle accidents and driving records from public sources."[77] According to Verisk, "[a]dding billions of driver risk records improves the granularity of our innovative risk-indicator solutions and will help customers advance their digital

---

[76] *Verisk Acquires Data Driven Safety to Further Expand Auto Insurance Analytics*, Verisk Analytics, Inc. (Nov. 2, 2021), https://www.verisk.com/company/newsroom/verisk-acquires-data-driven-safety-to-further-expand-auto-insurance-analytics/.
[77] *Id.*

transformation strategies,"—that is, Verisk could empower insurance companies to increase insurance rates for customers that it deemed to be high-risk.[78]

112.    Verisk also used consumers' Driving Data to "forge strategic alliances" in the connected car ecosystem. In 2016, Verisk "forged a strategic alliance with Driveway Software to offer a smartphone telematics solution for auto manufacturers, their customers, and participating insurers in the exchange. The mobile application will enable owners of older-model vehicles to have a connected-car experience and apply driver scoring to the resulting data for insurers to use in their UBI programs."[79] That year, Verisk also "expanded [its] relationship with Duck Creek Technologies— a leading provider of software and services for insurers worldwide—by providing access to the exchange. Duck Creek will receive driving data and risk scores from the exchange to support pricing models for the company's insurer customers."[80]

113.    In 2019, "Verisk teamed with TrueMotion to offer integrated telematics solutions that combine mobile data with Verisk driving-behavior analytics. The

---

[78] *Id.*

[79] Verisk, 2016 Annual Report, at p. 8.

[80] Verisk, 2016 Annual Report, at p. 8; *Verisk Insurance Solutions Expands Relationship with Duck Creek Technologies by Providing Access to Verisk Data Exchange*, Verisk.com (Dec. 21, 2016), available at https://www.verisk.com/company/newsroom/verisk-insurance-solutions-expands-relationship-with-duck-creek-technologies-by-providing-access-to-verisk-data-exchange/ (last accessed Nov. 29, 2024).

agreement helps insurers quickly deploy or enhance existing usage-based insurance programs."[81]

114.    In 2020, Verisk "launched new telematics data integrations with Honda and Geotab,"[82] boasting that Driving Data "will be available across Verisk's portfolio of telematics products, expanding the reach of the Verisk Data Exchange…. We are making more OEM data available to insurers, so they can reach more of the market[.]"83

115.    In 2022, Verisk partnered with "insuretech innovator Mile Auto" to connect Miles Auto to the Verisk Data Exchange and "its network of automakers."84 Verisk announced that Miles Auto would be using at least two solutions—Discount Alert and DrivingDNA Mileage—to "target low-mileage drivers" and "access verified odometer readings." In the announcement, Joe Wodark, General Manager of Verisk's Telematics business, boasted: "Mileage information and odometer readings are highly predictive but have been notoriously difficult for insurers to

---

[81] Verisk, 2019 Annual Report, at p. 10.

[82] Verisk, 2020 Annual Report, at p. 15.

[83] *Verisk Telematics Data Integration with Honda Now Live, Providing New Opportunities for Usage-Based Insurance Innovation*, VERISK (Aug. 6, 2020), available at https://www.verisk.com/company/newsroom/verisk-telematics-data-integration-with-honda-now-live-providing-new-opportunities-for-usage-based-insurance-innovation/.

[84] *Miles Auto Enhances Insurance Experience for Low-Mileage Drivers with Verisk Telematics*, VERISK (March 15, 2022), available at https://www.verisk.com/company/newsroom/mile-auto-enhances-insurance-experience-for-low-mileage-drivers-with-verisk-telematics/.

access or trust…. The verified data we provide through DrivingDNA Mileage will help overcome those challenges[.]"[85]

116.    Verisk made significant sums of money off of these privacy-violating practices.

117.    The driver data compiled via GM was inaccurate, flawed, and materially misleading.    Verisk knew or was reckless in not knowing that the information was inaccurate, flawed, and materially misleading.    Regardless, Verisk prepared inaccurate, flawed, and materially misleading reports relating to Plaintiffs and Class Members based on driver behavior data collected by GM.

118.    Verisk knew that the consumer reports prepared with consumers' driving data were inaccurate. Plaintiffs and consumers nationwide have reported on such errors.

119.    Like in 2011, public backlash and outrage over GM's data sharing practices was swift. "The revelations about OnStar Smart Driver and data sharing have resonated deeply within the []community and beyond, highlighting a spectrum of concerns" one article reported. Specifically, the article emphasized the importance of "The Right to Control Personal Data," stating "Amid growing calls for the ability

---

[85] *Miles Auto Enhances Insurance Experience for Low-Mileage Drivers with Verisk Telematics*, VERISK (March 15, 2022), available at https://www.verisk.com/company/newsroom/mile-auto-enhances-insurance-experience-for-low-mileage-drivers-with-verisk-telematics/.

to disable or opt out of data collection systems, there is a clear desire among vehicle owners for more autonomy over their personal information and the technology embedded in their vehicles…. The lesson here for GM and the broader automotive industry is the paramount importance of upholding transparency, securing informed consent, and honoring privacy."[86]

120.   Less than one week after its scheme was exposed, on March 20, 2024, GM announced it was ending its relationship with Verisk.[87] GM spokesperson Kevin Kelly sent the *Detroit Free Press* the following statement: "As of March 20th, OnStar Smart Driver customer data is no longer being shared with. . . Verisk. Customer trust is a priority for us, and we are actively evaluating our privacy processes and policies." Kelly declined to provide any further information, and did not explain what would happen to the driving data and PII that GM already transmitted to Verisk, a consumer reporting agency or "CRA."

121.   At Verisk's Spring Insurance Conference (VIC), in April/May 2024, Verisk announced the discontinuation of its telematics program. CEO Lee Shavel

---

[86] *Not So Smart Driver – Our Chevrolet, Buick, and GMC Vehicles Are Snitching To Our Insurance and Yours Is Too*, GM-TRUCKS.COM (Mar. 22, 2024) https://www.gm-trucks.com/onstar-smart-driver-chevrolet-buick-gmc-insurance/ (last accessed Nov. 10, 2024).

[87] Jamie L. LaReau, *GM cuts ties with 2 data firms amid heated lawsuits over driver data*, DETROIT FREE PRESS (Mar. 22, 2024), https://www.freep.com/story/money/cars/general-motors/2024/03/22/gm-data-firms-lexis-nexis/73057931007/ (last accessed Nov. 24, 2024).

explained the decision: "The simple answer is that the entities that were providing that data to us decided to discontinue collecting that data. And so there was really not sufficient analytical value in that without the data that was being provided. And I think it's fair to assume that it's a function of some of the media attention to collect connected car data. So that really was the simple reason."[88]

122.   In reality, Verisk obtained that data using deceptive, misleading, and illegal practices and made millions of dollars off of Plaintiffs' and Class Members' data before discontinuing its practices.

## TOLLING

123.   All applicable statute(s) of limitations have been tolled by Verisk's knowing and active concealment and denial of the facts alleged herein. Plaintiffs' and Class Members' causes of action could not have and did not accrue until shortly before the filing of this action, because Plaintiffs and Class Members could not have reasonably discovered Verisk's practice of covertly collecting, recording, using, sharing, and profiting from driving behavior data until shortly before this class action litigation began.

## CLASS ACTION ALLEGATIONS

---

[88] Shefi Ben-Hutta, *Verisk discontinues telematics offerings and more*, COVERAGER (Mar 2, 2024), https://coverager.com/verisk-discontinues-telematics-offering-and-more/ (last accessed Nov. 24, 2024).

124.   Plaintiffs bring action individually and on behalf of all other similarly situated individuals pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and Plaintiffs seek certification of the following classes:

> **Nationwide Class**: All persons residing in the United States whose GM-branded vehicle's driving data was collected, stored, distributed, and/or sold by Verisk.
>
> **State Subclass**:  All persons residing in [state] whose GM-branded vehicle's driving data was collected, stored, distributed, and/or sold by Verisk without their consent.  Each claim for relief is brought on behalf of state subclasses in the alternative to the Nationwide Class.
>
> **FCRA Subclass**: All Nationwide Class members whose driver data was shared with third parties in reports by Verisk.

125.   Excluded from the Classes are Defendant, any entity in which Defendant has a controlling interest, any of the officers or directors of Defendant, the legal representatives, heirs, successors, and assigns of Defendant, and any Judge to whom this case is assigned, and his or her immediate family.

126.   The Class Period extends from the date that Defendant began implementing the practices described in this Complaint to the date of entry of judgment.

127.   Plaintiffs' claims described in detail below satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action pursuant to Fed. R. Civ. P. 23.

128.   <u>Numerosity</u>: The class numbers in the millions of persons. As a result, joinder of all class members in a single action is impracticable.

129.   All members of the Class are ascertainable by reference to objective criteria, as Defendant has access to names, addresses, and other contact information for Class members that can be used for notice purposes. Class members may be informed of the pendency of this action through regular mail, e-mail, text, and/or posting of an approved notice.

130.   <u>Common Questions of Law and Fact Predominate</u>: There are common questions of fact and law to the classes that predominate over any questions affecting only individual class members. The questions of law and fact common to the classes arising from Defendant's acts and omissions include, without limitation, the following:

    a.  Whether Verisk collected and tracked Plaintiffs' and the Class Members' driving behavior;

    b.  Whether Plaintiffs and the Class Members consented to such collection;

    c.  Whether Plaintiffs and the Class Members consented to have their data shared with Verisk;

    d.  Whether Verisk knew, or should have known, that GM did not have consent to transmit Class Members' data to it;

e.  Whether Verisk obtained Plaintiffs' and Class Members' driver behavior data without consent;

f.  Whether Verisk sold Plaintiffs' and Class Members' driver behavior data to third parties without consent;

g.  Whether the reports are "inaccurate" within the meaning of § 1681e(b);

h.  Whether Verisk followed reasonable procedures to assure maximum possible accuracy of the driving data reports as required by § 1681e(b);

i.  Whether Verisk's conduct constitutes violations of the Fair Credit Reporting Act;

j.  Whether Verisk's conduct constitutes violations of the Federal Wiretap Act;

k.  Whether Verisk was unjustly enriched;

l.  Whether Verisk is liable for damages, and the amount of such damages; and

m. Whether Verisk should be enjoined from such conduct in the future.

131. <u>Typicality</u>: Plaintiffs' claims are typical of those of the class in that all were subject to the same data collection, use, and sharing practices of Defendant.

132. <u>Superiority</u>: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary

duplication of evidence, effort, and expense that numerous individual actions would produce. Defendant has acted or refused to act on grounds generally applicable to the class. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Separate actions by individual class members would unnecessarily burden the courts, could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of class members to protect their interests.

133.  <u>Adequacy</u>: Plaintiffs are adequate representatives because they are members of the classes they seek to represent, and their interests do not conflict with the interests of the members of those classes. The interests of the members of the classes will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who are experienced prosecuting complex consumer class actions, including in multi-district litigation involving privacy.

134.  To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into additional subclasses. To the extent Plaintiffs seek

declarative or injunctive relief, Defendant has acted or refused to act on grounds that apply generally to the class, rendering certification under Rule 23(b)(2) appropriate.

## CLAIMS ON BEHALF OF THE NATIONWIDE CLASS

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE FEDERAL WIRETAP ACT,
### 18 U.S.C. §§ 2510, *et seq.*

*On Behalf of Plaintiffs and the Nationwide Class Against Verisk*

135.   Plaintiffs and Class Members repeat and reallege Paragraphs 1-134, as if fully alleged herein.

136.   Verisk, a corporation, is a person as defined under 18 U.S.C. § 2510(6).

137.   In violation of 18 U.S.C. § 2511(1)(c), Verisk intentionally disclosed or endeavored to disclose to third parties the contents of the communications intercepted by GM and OnStar described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a).

138.   In violation of 18 U.S.C. § 2511(1)(d), Verisk intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a).

139.   Verisk has used and disclosed the contents of the communications described above for its own financial and commercial benefit, obtaining substantial profit.

140.   Verisk knew or had reason to know that the information it obtained from GM was obtained through the unlawful interception of communications in violation of 18 U.S.C. § 2511(1)(a).

141.   Verisk also knew or should have known that the detailed personal driving information was obtained in violation of the FWA in light of representations GM and OnStar made to Verisk.

142.   Verisk also knew or should have known that the detailed personal driving information it obtained from GM and OnStar was obtained in violation of the FWA because, as a CRA, it has an independent legal obligation to ensure the accuracy and legitimacy of such information, including that its disclosure was consented to by the consumer.

143.   Verisk also knew or should have known that the information GM and OnStar provided to it was captured in secret in violation of 18 U.S.C. § 2511(1)(a) because the capture of driving data did not become public knowledge until 2024, demonstrating consumers were unaware of the capture.

144.   Verisk further knew or should have known that GM and OnStar collected personally identifiable driving data in violation of 18 U.S.C. § 2511(1)(a)

when it was reported that GM and OnStar collected this information without driver knowledge or consent.

145.   As a result, Plaintiffs and Class Members have suffered harm and injury due to the interception, disclosure, and/or use of their private and personal information.

146.   Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the disclosure, and/or use of the electronic communications described above in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Verisk as a result of the violation or (b) statutory damages for each Class Member of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b) ("FCRA")

*On Behalf of Plaintiffs and the FCRA Subclass Against Verisk*

147.   Plaintiffs repeat and reallege Paragraphs 1-134, as if fully alleged herein.

148.   Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b).

149.   Verisk obtained driving-behavior data and other information, including location data, from GM and OnStar and furnished it to third parties, including automobile insurance companies, without Plaintiffs' and Class Members' adequate or appropriate knowledge and consent.

150.   Verisk is a "consumer reporting agencies" for the purposes of the FCRA, 15 U.S.C. § 1681a(f).

151.   Verisk, acting as a consumer reporting agency, as defined by 15 U.S.C. § 1681c(1), has failed to implement procedures to maintain maximum possible accuracy regarding Plaintiffs' and the Class Members' driving data.

152.   Verisk has knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiffs' and Class Members' driving abilities.

153.   As a result of Verisk's reporting of these inaccurate data metrics, insurance carriers and others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiffs' and Class Members' driving abilities.

154.   The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. § 1681e(b).

155.   As a result of each and every willful violation of the FCRA, Plaintiffs and the Class are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3).

### THIRD CLAIM FOR RELIEF

### UNJUST ENRICHMENT

*On Behalf of Plaintiffs and the Nationwide Class Against Verisk*

156.   Plaintiffs repeat and reallege Paragraphs 1-134, as if fully alleged herein.

157.   Plaintiffs and the Class unknowingly conferred the benefit of their driving telematics data on Verisk.

158.   Verisk knew and appreciated that benefit: GM and OnStar collected and sold Plaintiffs' data without their consent to Verisk, and Verisk and other third parties in turn sold the information to other third parties.

159.   Plaintiffs and the Class received no benefit from this use and sale of their data. Indeed, because Plaintiffs did not consent to Verisk's collection and sale of Plaintiffs' driving telematics data, they could not and do not benefit from such

practices. It is therefore inequitable for Verisk to retain any profit from such collection and sale without payment to Plaintiffs for the value of Plaintiffs' driving data.

160.   Verisk has therefore been unjustly enriched and Plaintiffs and the Class are entitled to restitution.

## **REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of members of the Class and Subclasses, as applicable, respectfully request that the Court enter judgment in their favor and against Verisk, as follows:

A.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Co-Lead and Co-Liaison Counsel as Class Counsel;

B.    That the Court grant permanent injunctive relief to prohibit Verisk from re-engaging in the unlawful acts, omissions, and practices described herein, and require Verisk to destroy any information that it obtained pursuant to the aforementioned deceptive, misleading, and unlawful practices;

C.    That the Court award Plaintiffs and Class and Subclass members compensatory, consequential, and general damages in an amount to be determined at trial;

D.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Verisk as a result of its unlawful acts, omissions, and practices;

E.    That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

F.    That Plaintiffs be granted the declaratory relief sought herein;

G.    That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.    That the Court award pre- and post-judgment interest at the maximum legal rate; and

I.    That the Court grant all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable.

Date: December 13, 2024          Respectfully submitted,


/s/ *Mark A. DiCello*
MARK A. DICELLO
N.J. Bar No. 306102019
madicello@dicellolevitt.com
**DiCELLO LEVITT LLP**
8160 Norton Parkway
Mentor, Ohio 44060
Telephone: (440) 953-8888

AMY E. KELLER
*Pro Hac Vice to be filed*
akeller@dicellolevitt.com
**DiCELLO LEVITT LLP**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900

*Amy Keller is filing in her capacity as Co-Lead Counsel for the GM-OnStar Track in the pending MDL captioned In re Consumer Vehicle Driving Data Tracking Collection Litigation, MDL No. 3115 (N.D. Ga.), on behalf of the Plaintiffs and Putative Class Members*